Filed 12/3/24  P. v. Nelson CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>PETER JAMES NELSON,<br><br>　　　　Defendant and Appellant. | C099118<br><br>(Super. Ct. No. 62-183112B) |

Conspiring with two inmates, defendant Peter James Nelson fraudulently applied for unemployment benefits in the name of one of the inmates.  A jury found him guilty of unemployment benefit fraud, conspiracy to commit unemployment benefit fraud, grand theft, and perjury by false application for aid.  Defendant contends the trial court erred by not instructing the jury on the defenses of duress and necessity.  He also asserts the court

1

sentenced him in violation of Penal Code section 654.  (Statutory section citations that follow are found in the Penal Code unless otherwise stated.)

Except to remand for resentencing, we affirm the judgment.

FACTS AND HISTORY OF THE PROCEEDINGS

In 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act (the CARES Act, 42 U.S.C. § 801(a)(2)(B)) to provide additional unemployment insurance benefits to persons affected by the COVID-19 pandemic.  The law provided unemployment benefits to persons who were not otherwise eligible, such as those who were self-employed, worked as independent contractors, or worked part time, and who lost work due to the pandemic.  The law also provided additional cash benefits and extended the maximum time a person could receive unemployment benefits from 26 weeks to 86 weeks.

The Employment Development Department (Department), the state agency that processes claims for unemployment benefits, requires claimants to provide identification, income amounts, and employment status as part of their claim.  The Department also requires benefit recipients, as a condition to receive the next benefit payment, to certify every two weeks that they remain unemployed but are able to begin work.

Prior to the pandemic, the Department would verify a claimant's income based on what was reported in the claimant's W-2 form.  The Department did this to establish the claim's validity and the claimant's benefit amount.  The verification acted as a safeguard against fraud.

After the CARES Act was adopted, however, the Department stopped verifying applicants' incomes.  This was due to the volume of claims and the urgency to make payments to individuals who had lost wages.  Income verification would have delayed that process.  Admittedly, after income verification was discontinued, the Department experienced an influx of fraudulent claims.  It became aware that even inmates were

2

applying for unemployment benefits. Inmates are not eligible for unemployment benefits because they are not available to begin work.

In the summer of 2020, Ronald Sandwell was an inmate in the Placer County jail. Defendant had previously been an inmate, but he was out of custody at the time. Using the jail's phone system, Sandwell would contact defendant and provide him with other inmates' information to use to apply for unemployment benefits. The two would agree to give a small amount of the money to the inmate and divide the remaining money between themselves.

During a jail call on July 27, 2020, Sandwell introduced defendant to Travis Kevie, another Placer County jail inmate. In a subsequent call that day, defendant received Kevie's personal information. Defendant applied for unemployment benefits in Kevie's name the following day, July 28. On July 31, Sandwell and defendant discussed how they would divide Kevie's unemployment payments. They planned to divide most of the money between themselves and give Kevie a small fraction. On August 3, 2020, defendant informed Sandwell that Kevie's Department debit card had arrived.

Defendant sent himself several payments from Kevie's card, either directly from the card to his CashApp account, or indirectly from the card to Kevie's CashApp account, which then forwarded the money to defendant's CashApp account. Defendant also pulled cash directly off the card at ATM machines.

In addition to filing the initial application for benefits on Kevie's behalf, defendant filed under penalty of perjury 21 recertification applications for unemployment benefits on a bi-weekly basis for the remainder of 2020. In total, approximately $30,000 in unemployment benefits were fraudulently obtained on Kevie's behalf.

Defendant testified at his trial, and he admitted committing every crime charged against him. We will describe his testimony in more detail below.

A jury found defendant guilty of unemployment benefit fraud, conspiracy to commit unemployment benefit fraud, grand theft, and perjury by false application for aid.

3

(Unemp. Ins. Code, § 2101, subd. (a); §§ 182, subd. (a)(1); 487, subd. (a), 118.)  The trial court found true an allegation that defendant had previously been convicted of a serious or violent felony for purposes of the Three Strikes law.  (§§ 667, subds. (b)-(i); 1170.12, subds. (a)-(d).)

The trial court sentenced defendant to a prison term of seven years, four months: six years on the perjury conviction (the middle term of three years doubled for the prior strike), plus one year four months on the conspiracy conviction (one-third the middle term, doubled).  The court sentenced defendant to concurrent terms of two years each, doubled to four years, for the fraud and theft convictions.

DISCUSSION

I

*Necessity and Duress Instructions*

A trial court must instruct a jury on any affirmative defense that is supported by substantial evidence in the record and is consistent with the defendant's theory of the case.  (*People v. Salas* (2006) 37 Cal.4th 967, 982.)  Defendant contends the trial court erred by not instructing the jury on the defenses of necessity and duress.  He asserts there was substantial evidence that his crimes were the product of necessity and duress, and the trial court thus had a duty to instruct on the defenses.  We review de novo defendant's claim that the court did not properly instruct on the applicable principles of law.  (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.)

A.    Background

Any evidence of necessity or duress is to be found in defendant's trial testimony, which we now summarize.

4

### 1. Defendant's testimony

Defendant was arrested in 2017 and transferred to Sacramento County. Sandwell was defendant's cellmate at the Sacramento County Jail. Defendant was "beyond scared" upon meeting him. Sandwell was an "extremely aggressive-looking muscular older gentleman" with multiple white power and tattoo icons over his chest. He was very aggressive and assertive. He asked to know defendant's last name, race, and why he was there. He "called the shots" in that section of the jail, and defendant had to live by his rules. Sandwell told defendant he had spent time in Folsom Prison where he was an associate of the Aryan Brotherhood and was one of the gang's "master weapon makers."

Defendant roomed with Sandwell for about a year and a half, and then he was moved to the Deuel Vocational Institute in Tracy. About two weeks after defendant arrived, a race riot broke out. Someone sucker-punched defendant in the face, smashing two of his front teeth and knocking him to the ground. He did not see who hit him.

Defendant testified that about a month after arriving at Deuel, he received a note under his door. The note told defendant that Sandwell was there on the yard and that defendant needed to meet with him. Defendant did not know how Sandwell found him. At their meeting, Sandwell said defendant needed to be "cliqued up"; associated with a certain group on the yard, or else he would be a target of further violence. Sandwell offered defendant protection if defendant "stuck with him"; if Sandwell had defendant's back, defendant had his. Sandwell gave defendant names of inmates to contact if he was transferred to Avenal or Chowchilla.

Defendant was transferred to Avenal to serve a sentence of a year and a half. There, he contacted the person he had been instructed to contact, someone named Bert. Bert explained the rules of the yard, and he offered to help defendant get a job as a laundry clerk. Defendant had no problems while at Avenal.

5

In January 2020, defendant was released from custody and paroled to his aunt's house in Cherry Valley, Riverside County. He testified he started receiving restricted and unknown phone calls at his aunt's house from people who identified themselves as friends of Sandwell or Sandwell's family. Other people visited the house uninvited. They gave defendant a burner phone. They told him to be available for a phone call from Sandwell and that he would be receiving instructions. They would often give him instructions to take money and give it to other individuals.

Defendant testified that since leaving Avenal, he had "[e]asily hundreds of contacts" with Sandwell or his associates, and they had come to his aunt's house at least two dozen times. This "scared the crap out of [him]," especially the first couple of times. He did not know what was going on or who the people were until they identified themselves and explained why they were there.

Defendant was told he would have to pay off "financial dues that were put on [him]," meaning he had to pay back Sandwell and others for the protection they gave him in prison. To do this, he would have to provide money on people's prison ledgers for phones, do various jobs, and send legal paperwork to certain people. He was told to get a job as soon as possible so he could afford what he owed, but the pandemic hit in March 2020, and he could not find one. By June, he owed approximately $8,000. He borrowed the money from his aunt without telling her what it was for.

Defendant feared Sandwell at this point. Sandwell had told him what happened to people who crossed the Aryan Brotherhood. He relished telling stories about how he had killed people in prison and the rapes inside and outside of prison. "[A]ny horrible, disgusting thing you could think of he perpetrated on people." Defendant also felt his aunt was not safe.

Sandwell mentioned that his sister and her ex-husband were involved in unemployment fraud and cashing COVID stimulus checks for other people, but she was trying to pull out. Defendant testified that Sandwell got him involved in unemployment

6

fraud. Defendant believed he did not have a choice but to participate. In one of his "many calls," Sandwell introduced Kevie to defendant and directed defendant to take down Kevie's information.

Defendant testified that he committed the acts he was charged of committing because he had no choice. He was expected to do a lot of things, and unemployment fraud was one of them. He also bought items such as laptops and eyeglasses for Sandwell and his family, and he made payments to various "dark net websites." He withdrew cash from Bank of America using a debit card, and he either deposited the money into a Chase checking account or held it for people to pick up. Often, he deposited $1,000 from the Bank of America account into his own account. Defendant stated he was always receiving overtures or suggestions that he should do more work for Sandwell and his associates.

Defendant testified that Sandwell had contacted him recently. Sandwell wanted defendant, while he was participating in trial, to stay at one of Sandwell's properties in Georgetown with Sandwell's niece and a man defendant knew was an associate of the Aryan Brotherhood. This scared defendant, and he denied the invitation by giving Sandwell "multiple excuses."

Defendant feared that something could happen to him immediately if he did not comply with one of Sandwell's requests. Sandwell made veiled threats "from we're going to fuck with your parole, we're going to get you back inside, um, to bodily harm to myself, to my aunt." Defendant testified that but for his relationship with Sandwell and his fear of him, he would have never engaged in the charged conduct.

On cross-examination, defendant admitted he had been convicted of molesting the seven-year-old daughter of his girlfriend at the time. He acknowledged that his conviction "definitely played a part" in why he was under a threat at prison. Defendant stated that Sandwell still contacts him on a regular basis and directs and trusts him to further the criminal conspiracy. Sandwell thinks defendant will get the job done.

7

Defendant admitted that he had been able to tell Sandwell "no" on other occasions and on various subjects. Despite how "evil of a person" Sandwell is, he is reasonable. Defendant admitted that Sandwell had asked him if he wanted to do the unemployment scheme and had given him an opportunity to say no, but defendant said yes "because you don't say no to someone like Sandwell."

Defendant admitted there was not a specific, immediate threat made or a gun placed to his head each of the 22 times he applied to the Department for unemployment on Kevie's behalf. Rather, there was an "overarching threat": "the associates who visited my house were pretty specific." If he did not do anything they wanted, he "would be in a world of hurt." He or his aunt would be "in serious trouble." He did not know when because Sandwell's associates showed up whenever they wanted unannounced, and that added to his fear. "[A]nything could have popped up at any time." He was told not to go to authorities, so he didn't. Instead, he engaged in the fraud to help pay off his debt: "I was in a position where I felt no one could help me."

On redirect, defendant stated he felt he was under immediate threat when he pressed the button sending things to the Department because if he did not get it done, he or his aunt would be in serious trouble. As of the day of trial, the threat was still "extremely real" to him.

### 2. Trial court's ruling

After the presentation of the evidence, defendant requested the court to instruct on the defenses of necessity and duress. The trial court denied both motions. It stated:

> "So first as to the request for the instruction on duress, the Court denies the request and here is why:
>
> "In order for the Court to give an instruction on duress, the defense has to have some evidence to show that there was immediacy of the threat, and the caselaw is very clear that immediacy means right now, this second, not five

8

minutes from now, not two hours from now, or a different day. Someone is holding the literal gun to your head.

"And they give the very specific situation that is played out in Heath [*People v. Heath* (1989) 207 Cal.App.3d 892 (*Heath*)] which is where the defendant was in a car, was forced to do a robbery. However, in that case they found that it wasn't – he wasn't entitled to the instruction because, once he got out of the car, he had the ability to make a different decision.

"I had a very similar case, almost exactly similar case myself about 12 years ago, that the Court did not give the instruction on duress for that exact same reason and was upheld on appeal. It's not a citable – it's not an appellate case, so I can't cite it, but I just looked at it recently. Then – so that's on the issue of duress, again, because there's absolutely no evidence presented that there was an immediate threat in that moment.

"So then we move to the issue of the necessity defense, which is [CALCRIM No.] 3403. . . . So, likewise, the Court is denying the request for the necessity defense because, in order for the defense of necessity to apply, there has to be very specific elements and that – and it has to be a threat of significant imminent evil, with no reasonable legal alternative, without creating a greater danger than the one avoided, with a good faith belief that the criminal act was necessary to prevent the greater harm, and with such belief as objectively reasonable.

"Again, while there – in necessity, there's an opportunity, it doesn't have to be immediate, like right this·second, there has to be some evidence to show that that danger was going to happen and there was no adequate legal alternatives. . . .

"[A]gain, the Court does not find that the defense has demonstrated that they – that there's even any evidence to support all of those on necessity and to warrant the Court giving a necessity instruction. . . .

9

"And back on duress, I just want to read – there's the caselaw and I'm just quoting. 'The cases establish that a threat, no matter how serious or extreme, loses its immediacy if the aggressor is not present and capable of carrying out the threatened harm at the time of the crime.' That's immediate. And there's absolutely no temporal proximity here to the threat."

B.      Analysis

Duress and necessity are distinct defenses. Codified at section 26, the defense of duress declares that persons "who committed the act or made the omission charged under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused" are not capable of committing a crime. (§ 26, Six.) "Duress is an effective defense only when the actor responds to an immediate and imminent danger. '[A] fear of *future* harm to one's life does not relieve one of responsibility for the crimes he commits.' [Citations.] The person being threatened has no time to formulate what is a reasonable and viable course of conduct nor to formulate criminal intent. 'The unlawful acts of the person under duress are attributed to the coercing party who supplies the requisite mens rea . . . .' [Citation.] Thus, duress negates an element of the crime charged—the intent or capacity to commit the crime— and the defendant need raise only a reasonable doubt that he acted in the exercise of his free will." (*Heath, supra*, 207 Cal.App.3d at p. 900.)

Unlike duress, the defense of necessity is not codified in California. (*Heath, supra*, 207 Cal.App.3d at p. 900.) "By definition, the necessity defense is founded upon public policy and provides a justification distinct from the elements required to prove the crime. [Citation.] The situation presented to the defendant must be of an emergency nature, threatening physical harm, and lacking an alternative, legal course of action. [Citation.] The defense involves a determination that the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining

10

the offense charged. [Citation.] Necessity does not negate any element of the crime, but represents a public policy decision not to punish such an individual despite proof of the crime." (*Id*. at pp. 900-901.)

Understanding the differences between the defenses, we can quickly dismiss defendant's contention that the trial court erred by not instructing on duress. There was no evidence in the record that defendant was under an immediate threat. Defendant admitted that when he committed the charged offenses, he was not in immediate and imminent danger. There was no specific, immediate threat made or a weapon placed against or aimed at his body each time he applied to the Department for unemployment benefits in Kevie's name. At most, there was an "overarching threat" that he or his aunt "would be in a world of hurt" or "in serious trouble" if he did not participate in the conspiracy. An overarching threat as defendant described did not preclude defendant from forming the intent to engage in unemployment fraud and thus is not the type of immediate threat that would justify an instruction on duress. The trial court did not err when it determined not to instruct the jury on the defense of duress.

We turn to the defense of necessity. "The defendant, who must have possessed a reasonable belief that his or her action was justified, bears the burden of proffering evidence of the existence of an emergency situation involving the imminence of greater harm that the illegal act seeks to prevent." (*People v. Coffman & Marlow* (2004) 34 Cal.4th 1, 100.)

"An important factor of the necessity defense involves the balancing of the harm to be avoided as opposed to the costs of the criminal conduct. [Citation.] Unlike duress, the threatened harm is in the immediate future, which contemplates the defendant having time to balance alternative courses of conduct. [Citation.] The defendant has the time, however limited, to form the general intent required for the crime, although under some outside pressure. [Citation.] Thus, the defense does not negate the intent element, and

the defendant has the burden of proving the defense by a preponderance of the evidence." (*Heath, supra*, 207 Cal.App.3d at p. 901.)

To justify an instruction on the defense of necessity," 'there must be evidence sufficient to establish that defendant violated the law (1) to prevent a significant evil, (2) with no adequate alternative, (3) without creating a greater danger than the one avoided, (4) with a good faith belief in the necessity, (5) with such belief being objectively reasonable, and (6) under circumstances in which he did not substantially contribute to the emergency.' " (*People v. Trujeque* (2015) 61 Cal.4th 227, 273.)

Defendant contends there was substantial evidence in the record supporting each of the six prerequisites for an instruction on necessity. We conclude there was insufficient evidence showing that defendant was responding to an emergency or that he had no adequate legal alternative.

As to the first factor, that of preventing a significant evil, there must be a showing of imminence of peril before the defense of necessity is applicable. A defendant is not entitled to claim a defense of necessity "unless and until he demonstrates that, given the imminence of the threat, violation of [the law] was his only reasonable alternative." (*United States v. Bailey* (1980) 444 U.S. 394, 411.) For purposes of the necessity defense, the threat must be in the immediate future such that the defendant has a limited time to form the general intent required for the crime, although under some outside pressure. (*Heath, supra*, 207 Cal.App.3d at p. 901.)

Here, there is no substantial evidence that defendant conspired and made his fraudulent applications to the Department under the type of threat that would impress upon him the necessity to act as if in an emergency in order to prevent a greater harm. Sandwell was in jail and could not reach defendant. Sandwell had regaled defendant with stories of his violence against those who crossed the Aryan Brotherhood, and there was an overarching threat that his associates might appear at defendant's aunt's house, but nothing indicated they would do so immediately after defendant may have chosen not to

12

make the fraudulent applications. The original application required a few days to gather the information from the inmate and apply for the benefits. A few additional days transpired before defendant received the Department debit card. Then he recertified his eligibility every two weeks, 21 times. Defendant had a significant amount of time to form the intent to file the fraudulent applications without sensing pressure he had to do so or else harm would result immediately.

There also is no substantial evidence that defendant had no adequate alternative but to commit unemployment fraud. Under any definition of the defenses of necessity or duress, "one principle remains constant: if there was a reasonable, legal alternative to violating the law, 'a chance both to refuse to do the criminal act and also to avoid the threatened harm,' the defenses will fail." (*United States v. Bailey, supra*, 444 U.S. at p. 410.) Defendant had both chances here.

Defendant could have refused to participate in the conspiracy. Sandwell asked, rather than ordered, defendant if he wanted to collaborate with him to commit unemployment fraud. In their July 23, 2020, jail conversation, Sandwell explained that his sister no longer wanted to do the work, and then he asked defendant, "Well, hey, um, would you rather do it?" Defendant answered, "Oh, I don't care." As defendant admitted, Sandwell gave him an opportunity to decide whether to participate. He could have said no, and nothing indicated a negative response would have resulted in immediate harm.

Moreover, defendant had an adequate alternative to avoid the harm. He could have contacted authorities and reported Sandwell's plan and any threats he may have received. Calling the police is one alternative to committing the crime. (See *People v. Kearns* (1997) 55 Cal.App.4th 1128, 1135 [asking the victim to call the police instead of carrying out the robbery was a reasonable alternative].) "The normal and appropriate response to a perceived criminal emergency is to call the police. [¶] . . . [¶] As a matter of public policy, self-help by lawbreaking and violence cannot be countenanced where

13

the alleged danger is merely speculative and the lawbreaker has made no attempt to enlist law enforcement on his side." (*People v. Miceli* (2002) 104 Cal.App.4th 256, 267-268.) Although defendant was told not to contact authorities, and he knew of the threats against people who crossed the Aryan Brotherhood, he did not show that contacting authorities would not have been effective.

Due to a lack of substantial evidence showing an emergency or a lack of available alternatives, the trial court did not err by not instructing the jury on the defense of necessity.

II

*Section 654*

Section 654 prohibits punishing a defendant more than once for a single criminal act or for an indivisible course of criminal conduct that reflects a single intent or objective. (§ 654, subd. (a); *People v. Corpening* (2016) 2 Cal.5th 307, 311.) Defendant contends the trial court erred by not staying execution of sentence under section 654 on three of his four convictions. He argues that all four convictions arose from a single course of conduct to obtain unemployment benefits, and thus under section 654 only one punishment could be imposed.

Recall that the jury found defendant guilty of one count each of unemployment benefit fraud (count 1), conspiracy to commit unemployment benefit fraud (count 2), grand theft (count 3), and perjury by false application for aid (count 4). (Unemp. Ins. Code, § 2101, subd. (a); §§ 182, subd. (a)(1); 487, subd. (a), 118.) At sentencing, defendant claimed that for purposes of section 654, there was a singular intent and objective to his actions, which was to get the full term of unemployment benefits. Recertifying every two weeks was in furtherance of the same intent and objective.

The trial court disagreed with defendant. It stated, "It's not a 654 issue for me. It is just the issue of the Court looking at when is consecutive or concurrent sentencing

14

appropriate under the circumstances and the facts of this case." The court sentenced defendant under Three Strikes on count 4 to six years plus a consecutive one-year four months on count 2. It sentenced defendant to concurrent terms of four years each on counts 1 and 3.

" 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the *intent and objective* of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208, quoting *Neal v. State of California* (1960) 55 Cal.2d 11, 19, disapproved on another ground in *People v. Correa* (2012) 54 Cal.4th 331, 334.)

On the other hand, if the defendant "entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct." (*People v. Beamon* (1973) 8 Cal.3d 625, 639.)

Generally, the determination of whether there was more than one objective "is a factual determination, which will not be reversed on appeal unless unsupported by the evidence presented at trial. [Citation.] The factual finding that there was more than one objective must be supported by substantial evidence." (*People v. Saffle* (1992) 4 Cal.App.4th 434, 438; *People v. Osband* (1996) 13 Cal.4th 622, 730.) However, the applicability of section 654 to *conceded* facts is a question of law. (*People v. Harrison* (1989) 48 Cal.3d 321, 335; *Neal v. State of California, supra*, 55 Cal.2d at p. 17.) Defendant conceded the facts as charged. We thus review the trial court's application of section 654 de novo.

Because defendant was convicted of conspiracy, the proper application of section 654 depends on whether he was punished for a conspiracy which had as its only objective the commission of the other offenses charged. (*In re Cruz* (1966) 64 Cal.2d 178, 180-

15

181.)  Under section 654, a defendant may not be punished for both the underlying crimes and the conspiracy where there was no showing that the object of the conspiracy was any broader than committing the underlying crimes.  (*People v. Lewis* (2008) 43 Cal.4th 415, 539, disapproved on another ground in *People v. Black* (2014) 58 Cal.4th 912, 919-920.)  "[I]t would violate [section 654] to sentence a defendant for conspiracy to commit several crimes and for each of those crimes where the conspiracy had no objective apart from those crimes.  If, however, a conspiracy had an objective apart from an offense for which the defendant is punished, he may properly be sentenced for the conspiracy as well as for that offense."  (*Cruz*, at pp. 180-181.)

The information charged defendant with conspiracy to commit unemployment fraud plus three additional crimes, each of which were committed as part of the conspiracy.  Count 2 alleged that defendant and Kevie unlawfully conspired together and with another unknown person to commit unemployment benefit fraud between July 28 and December 9, 2020.  The information alleged that to carry out the conspiracy, defendant and Kevie committed the following overt acts:  (1) Kevie asked defendant to complete his unemployment application while Kevie was in custody; (2) Kevie provided defendant with answers to questions on the application; (3) Defendant completed the application for Kevie; (4) Kevie promised financial rewards to defendant for assisting him with the fraudulent application; and (5) Kevie received funds as a result of the fraudulent application and paid defendant with funds from those benefits.

The information's other three counts alleged crimes committed as part of the conspiracy.  Count 1 alleged defendant and Kevie committed unemployment benefit fraud between July 28 and December 9, 2020, which is exactly what they had conspired to do.  They unlawfully made a false statement or representation, knowingly failed to disclose a material fact, or used a false name, social security number, or other false identification to obtain unemployment benefits.

16

Count 3 alleged that defendant and Kevie committed grand theft between July 28 and December 9, 2020, by taking unemployment benefit payments in excess of $950 which belonged to the Department. Receiving funds from the fraudulent application was one of the conspiracy's alleged overt acts.

And count 4 alleged that defendant committed perjury by false application for aid between July 28 and December 21, 2020, by certifying under penalty of perjury on an application for aid that he met the conditions of eligibility which he knew to be false. The trial court instructed the jury that the prosecution specifically alleged that defendant falsely claimed that Kevie was available to begin work immediately and that Kevie was the person signing his application or recertification for unemployment benefits. Defendant completing the application for Kevie while Kevie was in custody and thus unavailable to begin work was one of the alleged overt acts of the conspiracy.

Thus, defendant's unlawful actions as charged in counts 1, 3, and 4 and as proven shared the same objective as, and were part of, the conspiracy charged in count 2. Section 654 prohibits punishing defendant for the individual acts when he was also punished for the conspiracy to commit those acts. (*In re Cruz, supra*, 64 Cal.2d at pp. 180-181.)

The Attorney General argues that the conspiracy was a wide-ranging enterprise intended to include as many inmates as Sandwell could find, not just Kevie. Indeed, there is evidence in the record that Sandwell and defendant attempted to commit the same fraud using the identification of at least two other inmates. But the Attorney General asserts that, in contrast to this wide-ranging conspiracy, counts 1, 3, and 4 focused only on the conspiracy between defendant and Kivie. Count 1 was based solely on defendant's actions in securing benefits for Kevie. Perjury occurred on the initial application and the 21 recertifications submitted on Kevie's behalf. And grand theft was established by defendant's personal benefit from the fraud scheme as he diverted large sums of money from Kevie's unemployment award without Kevie's consent. From this,

the Attorney General argues that defendant entertained multiple criminal objectives that were independent and not incidental to each other.

We disagree with the Attorney General. Unless the conspiracy had a broader objective than the commission of the overt acts, a defendant cannot be punished for the overt acts and the conspiracy. (*People v. Lewis, supra*, 43 Cal.4th at p. 539.) Defendant was not charged with a conspiracy having a broader objective than the commission of the charged crimes. The information charged him with committing a conspiracy only between Kevie, an unknown person, and himself. The substantive crimes concerned only defendant and Kevie.

Although evidence of other conspiracies between defendant and other inmates was introduced, the trial court instructed the jury that such uncharged crime evidence could be considered only for the limited purposes of deciding whether defendant acted with intent to defraud in this case, had a motive to commit the alleged offenses, or had a plan or scheme to commit the alleged offenses. (CALCRIM No. 375.) The court prohibited the jury from considering the evidence for any other purpose, including relying solely on the uncharged crime evidence to convict defendant on the charged offenses. Thus, under the instructions given, the jury could not have found defendant guilty of a conspiracy having a broader objective than the one charged between defendant, Kevie, and Sandwell. (*In re Romano* (1966) 64 Cal.2d 826, 829.)

Because defendant was punished for an alleged conspiracy which had as its only objective the commission of the other three offenses charged, under section 654 he can be punished for only one of the four offenses.

DISPOSITION

The matter is remanded for resentencing under section 654 and in accordance with this opinion.  In all other respects, the judgment is affirmed.


_____
HULL, Acting P. J.


We concur:



_____
BOULWARE EURIE, J.



_____
WISEMAN, J.*



_____

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19